**LEHIGH GAS & OIL COMPANY,**
Petitioner,

v.

**PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL RESOURCES,**
Respondent.

Commonwealth Court of Pennsylvania.

Argued Oct. 16, 1995.
Decided Dec. 4, 1995.
Publication Ordered Feb. 1, 1996.

Anthony J. Mazullo, Jr., for Petitioner.

Barbara L. Smith, for Respondent.

Before DOYLE and SMITH, JJ., and SILVESTRI, Senior Judge.

SILVESTRI, Senior Judge.

Lehigh Gas & Oil Company (Lehigh) petitions for review of an order and adjudication from the Environmental Hearing Board (Board) which dismissed Lehigh's appeal from the Department of Environmental Resources' (DER) December 10, 1991 order directing Lehigh to take certain measures to remedy the contamination resulting from the discharge of petroleum products [1] at the Hartranft Service Station (Station).

---

1. The contamination was in the form of various chemicals (benzene, toluene, ethylbenzene, and xylene) all of which are components of gasoline and are often referred to as BTEX.

The Station is located in the southeastern quadrant of the intersections of Route 54 and Clearmont Avenue in the village of Hometown (Hometown).[2] Located underground of the Station were six storage tanks[3] which were owned by Lehigh. On January 7, 1991, the Department received a complaint from the Rush Township Sewer Authority concerning petroleum odors in the homes and sewer lines in Hometown. In response thereto, DER conducted a preliminary investigation which identified two potential sources of the contamination: 1) the Station; and 2) a pipeline owned and operated by Sun Pipe Line Company (Sun).[4] The contamination pervaded the air, water, and soil primarily within in the southeastern quadrant of Hometown from the Station to McMullen's Pond (Pond).[5]

On January 8, 1991, DER determined through its investigation that a 5,000–10,000 gallon release had occurred at the Station over the past two years.[6] On January 15, 1991, Lehigh confirmed a recent release at the Station. On January 23, 1991, DER issued a notice of violation to Lehigh setting forth Lehigh's responsibilities to do a site assessment and integrity testing of lines and systems in order to define the vertical and horizontal extent of the contamination as verified by specific field investigations.[7] In response thereto, Lehigh submitted a proposed site characterization plan[8] on February 8, 1991; said plan was tentatively approved by DER in March of 1991 subject to additional amendments. During the implementation of the plan, certain remedial actions were undertaken by both Lehigh and DER; in addition thereto, testing continued by Lehigh, DER, and Sun.

On December 3, 1991, Lehigh submitted an amended site characterization and partial remediation plan which claimed that the contamination from the Station was limited to its immediate vicinity, i.e. the area south of Route 54 between Clearmont and Cumberland Avenues, and as a result thereof Lehigh would take no remedial action other than the removal of the tanks themselves. After reviewing the amended site characterization plan, DER concluded that it did not adequately define the vertical and horizontal extent of the contamination.

On December 10, 1991, DER issued an administrative order[9] in which it made Find-

---

2. Hometown is located in Rush Township, Schuylkill County. Route 54 is also known as Lafayette Street as it runs in an east-west direction through Hometown while Clearmont Avenue runs in a north-south direction through the same.

3. The six underground storage tanks had the following capacity and contents: three (3) 4,000 gallon tanks for gasoline; one (1) 3,000 gallon tank for gasoline; one (1) 3,000 gallon tank for kerosene; and one (1) 2,000 gallon tank for diesel fuel.

4. Sun's pipeline is located in Hometown underneath Cumberland Avenue which runs in a north-south direction parallel to and east of Clearmont Avenue.

5. The Pond is located south of Route 54 and east of Cumberland Avenue approximately 1,300 feet from the Station which is located south of Route 54 between Clearmont and Cumberland Avenues. *See* Appendix A.

6. In 1990, Lehigh had to repair a leak to the conveyance system for the gasoline storage tanks; this leak was never reported to DER. Lehigh estimated that up to 5,000 gallons may have been released between the time the gasoline discrepancy was reported in November and when the repairs were completed in December; the operator of the Station, however, claimed an amount in excess of that figure.

7. On January 14, 1991, in response to a request by DER, Sun had conducted a product integrity pressure test of its pipeline. On January 15, 1991, Sun had its environmental consultant, Geraghty & Miller, do a preliminary soil gas survey in the area immediately adjacent to the pipeline. Based on the results of the two aforesaid investigations, DER determined that Sun's pipeline was competent in the vicinity of Hometown and therefore not the source of the contamination. Accordingly, Sun was never issued a notice of violation from DER and is not a party to this matter.

8. Lehigh hired two consulting firms, Quad Three Group, Inc. (Q3G), and Environmental Liability Management, Inc. (ELM), to prepare and implement the proposed site characterization plan.

9. DER issued its order pursuant to the provisions of the following statutes: the Storage Tank and Spill Prevention Act, Act of July 6, 1989, P.L. 169, *as amended*, 35 P.S. §§ 6021.101–6021.2104; The Clean Streams Law, Act of June 22, 1937, P.L.1987, *as amended*, 35 P.S. §§ 691.1–691.1001; the Solid Waste Manage-

ings (A–AA) and ordered, in pertinent part, as follows:

    1. Lehigh Gas and Oil Company shall further define the vertical and horizontal extent of contamination, fully verified by site-specific field investigation, emanating from the Hartranft Service Station. Lehigh Gas and Oil Company shall submit the findings of the field investigation and a full remediation plan (addressing air, water and soil contamination) within ninety (90) days of receipt of this Order.

    2. Lehigh Gas and Oil Company shall plan, construct and maintain a vapor recovery system at the Ryan, Evans and Bowe residences. Lehigh Gas and Oil Company shall identify its contractor and define the scope of work, both of which must be submitted to the Department for receipt by December 13, 1991.

    3. Lehigh Gas and Oil Company shall design, construct and maintain an interceptor trench immediately upgradient of the pond on the McMullen property in order to alleviate petroleum odors emanating from the pond and reduce the amount of petroleum product flowing into the pond. Lehigh Gas and Oil (sic) shall submit a work plan for Department approval, including but not limited to construction parameters for the interceptor trench within fourteen (14) days of receipt of this Order.... [10]

On December 17, 1991, Lehigh filed a notice of appeal seeking Board review of DER's order. During the pendency of the appeal, however, both Lehigh and DER continued to take steps to determine the source and extent of the contamination [11] as well as implementing measures to remedy the contamination as it currently existed.

On January 10, 1992, Lehigh submitted to DER a proposed phase II site characterization plan along with a proposed tank removal and site remediation plan pertaining to the underground tanks and systems at the Station. Pursuant thereto, the storage tanks and 1,533 tons of contaminated soil were removed from the immediate vicinity of the Station between January 22–31, 1992. Tests on the soil samples taken from the Station were conducted by Lehigh and DER both of whom continued to conduct additional tests of the soil, air, and water in the contaminated area; DER also continued to perform additional remedial measures.

During May of 1992, DER decided to have R.E. Wright Associates, Inc. (REW), a general environmental technical assistance contractor, do a hydrogeologic site characterization in the affected area of Hometown to determine the source and extent of hydrocarbon impact to the Pond and residences south of Route 54 and east of Clearmont Avenue. After learning that DER had contracted with REW to do a site characterization, Lehigh all but ceased further investigations of its own.[12] In its August 1992 report to DER, REW concluded that, based upon the documented release of gasoline at the Station, the direction of the groundwater flow from that site, the existence of a plume of contamination following the groundwater flow direction, and the surfacing of that contamination at the Pond, the Station was the source of the contamination. Based on the investigations of Lehigh and REW, as well as its own investigation, DER concluded that the Station was in fact the source of the contamina-

---

ment Act, Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§ 6018.101–6018.1003; The Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. §§ 51–732.

**10.** DER also ordered as follows:

    4. All work plans, specifications and site assessments, once approved by the Department, shall be an enforceable part of this Order. Lehigh Gas and Oil Company shall implement all work items above within fourteen (14) days of receipt of Department approval, unless otherwise directed by the Department.

    5. Within ten (10) days of receipt of this Order, Lehigh Gas and Oil Company shall submit to the Department all documents relating to petroleum deliveries and petroleum sales at Hartranft Service Station from November 1, 1988 to date.

These last two provisions of DER's order are not relevant herein.

**11.** At DER's direction, Sun conducted another integrity test of its pipeline on December 18–20, 1991. The test was performed by FB & D Technologies, Inc., a pipeline testing contractor, who concluded that the pipeline was sound.

**12.** On July 23, 1992, Lehigh took additional water samples and forwarded the results, which were dated August 21, 1992, to DER.

tion which existed south of Route 54 and extended east of both Clearmont and Cumberland Avenues from the Station to the Pond.

Without admitting responsibility for the contamination, Lehigh submitted to DER, in October of 1992, a proposed Remedial Action Plan which proposed, *inter alia*, to 1) continue the recovery of free product from the Pond and trench sump, 2) continue operation of the vapor extraction systems in the residences, and 3) continue venting the sewer system, as needed.[13] On November 3, 1992, DER met with Lehigh to discuss its disagreements with the proposed remedial action plan. By letter of November 5, 1992, DER set forth a list of ten matters requiring further clarification and/or additional data prior to implementation of the proposed remedial activities. (Exhibit S–10, R.R. 938a–940a).

No further action in this matter was taken until the Board conducted hearings, beginning on June 7 and continuing through July 6, 1993, during which Lehigh contested its liability for the contamination beyond the immediate vicinity of the Station and the reasonableness of the remediation required by DER. The Board predicated its decision upon Section 1311(a) of the Storage Tank and Spill Prevention Act (Storage Tank Act) which provides as follows:

(a) **General rule.**—Except as provided in subsection (b), it shall be presumed as a rebuttable presumption of law in civil and administrative proceedings that a person who owns or operates an aboveground or underground storage tank shall be liable, without proof of fault, negligence or causation, for all damages, contamination or pollution within 2,500 feet of the perimeter of the site of a storage tank containing or which contained a regulated substance of the type which caused the damage, contamination or pollution. Such presumption may be overcome by clear and convincing evidence that the person so charged did not contribute to the damage, contamination or pollution.

35 P.S. § 6021.1311(a).

■ The Board concluded that the presumption of liability applied, DER carried its burden of proof, and Lehigh did not overcome the presumption. The Board, pursuant to its scope of review[14], held that DER's order of December 10, 1991 was lawfully issued under the Storage Tank Act[15] and the remediation requirements imposed by DER[16] did not constitute an abuse of discretion. By order of June 1, 1994, the Board dismissed Lehigh's appeal.

■ In its brief to this Court[17], Lehigh raises the following two questions:

1. Was the finding by the Environmental Hearing Board that the Lehigh Gas and Oil Company was the cause of the petroleum contamination south of Route 54 and east of Cumberland Avenue based upon substantial evidence?

---

13. In October of 1992, Lehigh also filed with DER a closure report for the underground storage tanks at the Station.

14. When it issues an order like the one of December 10, 1991, DER has the burden of proving by a preponderance of the evidence that the order was lawful and an appropriate exercise of discretion. *See* 25 Pa.Code § 21.101(a) and (b)(3).

15. Because the Board determined that Lehigh is liable under the Storage Tank Act, it did not discuss liability under The Clean Streams Act, the Solid Waste Management Act, or the Administrative Code of 1929.

16. The Board noted in Finding of Fact No. 120 of its adjudication that of the five items required of Lehigh in DER's December 10, 1991 order,

from which the appeal was taken, three had been performed by DER or REW, one had been performed by Lehigh, and the remaining item is ongoing. The Board further noted that Lehigh only disputes two of the ten comments contained within DER's letter of November 5, 1992, namely comment No. 8 requiring remediation to be conducted to the best technology available, which are levels protective of human health, and comment No. 10 requiring the installation of an active vapor recovery system at the Station to remediate soil contamination to acceptable levels. (R.R. 939a–940a).

17. Our scope of review is limited to determining whether the Board committed constitutional violations, errors of law, or whether any necessary findings of fact were unsupported by substantial evidence. *Martin v. Department of Environmental Resources*, 120 Pa.Cmwlth. 269, 548 A.2d 675 (1988).

2. Did Lehigh Gas and Oil Company offer clear and convincing evidence that the discharge at the Hartranft's Service Station site did not contribute to the contamination south of Route 54 and east of Cumberland Avenue?

■ Lehigh accepts liability for the area of contamination south of Route 54 between Clearmont and Cumberland Avenues. Additionally, while the Board addressed the issue of the reasonableness of the remediation required by DER, Lehigh has not addressed any alleged errors pertaining to that portion of the Board's adjudication in its appeal here and thereby waives the same. *See* Pa.R.A.P. 2116, 2119; *Savage v. Unemployment Compensation Board of Review,* 89 Pa.Cmwlth. 61, 491 A.2d 947, 950 n. 6 (1985). Thus, the sole issue for our determination is whether or not the Board correctly concluded that, pursuant to Section 1311(a) of the Storage Tank Act, Lehigh is liable for the contamination south of Route 54 and east of Cumberland Avenue.

■ As stated previously, Section 1311(a) of the Storage Tank Act establishes the rebuttable presumption that the owner of an underground storage tank shall be liable, without proof of fault, negligence or causation, for all damages, contamination or pollution within 2,500 feet of the perimeter of the site of a storage tank containing or which contained a regulated substance of the type which caused the damage, contamination or pollution. *See* 35 P.S. § 6021.1311(a). There is no dispute that Lehigh's underground storage tanks contained the regulated substance which is the same type which caused the contamination. Additionally, there is no dispute that the area of contamination in question, that south of Route 54 and east of Cumberland Avenue, is within 2,500 feet of the perimeter of the Station. Thus, the Board correctly concluded that the presumption of liability in Section 1311(a) of the Storage Tank Act applied and that DER had carried its burden of proof in this regard.

Lehigh only takes issue with the Board's conclusion that it had not overcome the presumption. Section 1311(a) of the Storage Tank Act provides that "[s]uch presumption may be overcome by *clear and convincing*

*evidence* that the person so charged *did not contribute to the damage, contamination or pollution.*" (Emphasis added). 35 P.S. § 6021.1311(a). In order to meet the "clear and convincing evidence" standard,

[t]he witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable a jury to come to a clear conviction, without hesitancy, the truth of the precise facts in issue.

*Lessner v. Rubinson,* 527 Pa. 393, 400–401, 592 A.2d 678, 681 (1991) (citations omitted).

■ Initially, Lehigh argues that the Board erred in concluding that the tanks owned by Lehigh were the only source of the contamination because the Board's finding that Sun's pipeline was not leaking and therefore not a cause of the contamination south of Route 54 and east of Cumberland Avenue is not supported by substantial evidence. In so doing, Lehigh merely contends that Sun was not able to adequately prove that the pipeline was bubble tight and did not leak; however, whether or not Sun's pipeline leaked and was a possible source of the contamination is not relevant unless Lehigh is first able to prove by clear and convincing evidence that the tanks at the Station did not contribute to the contamination south of Route 54 and east of Cumberland Avenue.

Lehigh asserts that it established, by producing clear and convincing evidence, based upon scientifically defensible data, that the discharge at the Station was confined horizontally and vertically to the site and its immediate vicinity. In this regard, Lehigh advanced a two-plume theory which asserted that the first plume of contamination flowed with the groundwater from the Station in a south-easterly direction until it ended approximately one-hundred (100) feet away from the Station and seventy-five (75) feet west of Cumberland Avenue while a second, separate plume of contamination began in and or around Cumberland Avenue, between Pine Street and Lynwood Avenue, and extended south-east toward the Pond; the two-

plume theory was based on the collective expert testimony of Peter J. Brussock, Douglas G. Beaver, and Ronald M. Kaiserman. DER, on the other hand, advanced a single-plume theory in which there is only one plume of contamination which followed the flow of groundwater from the Station southeast underneath Cumberland Avenue all the way to the Pond; the single-plume theory was based on the collective expert testimony of Robert A. Gadinski, John R. Dielh, Richard A. Hoover, Christopher O'Neil, and David B. Meadows.

■ The Board noted that it considered the opinions of Lehigh's experts particularly those which pointed out anomalies in DER's single-plume theory; the Board further acknowledged it accepts the fact that multiple plumes of contamination are possible.[18] The Board concluded, however, that the more persuasive interpretation of the data results in a single-plume of contamination emanating from a known source (the Station) and extending to a known destination (the Pond) without any other known sources intervening between those two points. In so doing, the Board noted that the task of determining the direction of groundwater flow is not an exact science and therefore is left to the experts who interpret the available data on the basis of the education, training and expertise. It

18. The Board noted that if there were evidence of a pipeline leak, a two-plume theory would carry more weight; be that as it may, however, even if there was evidence that the pipeline did in fact leak, Lehigh's burden remained to establish, by clear and convincing evidence, that the Station did not contribute to the contamination.

is well established that credibility determinations are for the Board. *Martin*, 548 A.2d at 679 n. 4; *Pritz Auto, Inc. v. State Board of Vehicle Manufacturers, Dealers and Salespersons*, 113 Pa.Cmwlth. 89, 536 A.2d 485 (1988). The record herein, which was fully reviewed by the Board, consists of stipulations of facts, one-thousand five-hundred seventy-six (1,576) pages of testimony, and one-hundred fifty-six (156) exhibits. Our review of the same indicates that the Board's findings, which served as the basis for the aforementioned conclusions, were supported by substantial evidence.

Accordingly, having determined that Lehigh failed to overcome, by clear and convincing evidence, the rebuttable presumption of Section 1311(a) of the Storage Tank Act, 35 P.S. § 6021.1311(a), i.e. that the Station contributed to the contamination south of Route 54 and east of Cumberland Avenue, the order of the Board dismissing Lehigh's appeal will be affirmed.

### ORDER

AND NOW, this 4th day of December, 1995, the order of the Environmental Hearing Board, dated June 1, 1994, dismissing the appeal of Lehigh Gas & Oil Company, is affirmed.

## APPENDIX A